UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROY DAVID KINARD,

        Plaintiff,

v.                                         Case No. 3:22-cv-897-MMH-JBT

FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

        Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff Roy David Kinard, an inmate of the Florida Department of Corrections, initiated this action by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. He is proceeding on an Amended Complaint (Doc. 33; Amended Complaint). Kinard names four Defendants: (1) the Florida Department of Corrections (FDOC); (2) Ricky D. Dixon, Secretary of the FDOC; (3) Centurion of Florida, LLC; and (4) Dr. Asbelti Llorens Cordero, Chief Medical Provider for Union Correctional Institution.[1] Id. at 2. He alleges Defendants' failure to adequately treat his fractured foot violated his rights

---

[1] Throughout the Amended Complaint, Kinard refers to Dr. Cordero as Dr. "Llorens." See generally Amended Complaint. For consistency, the Court refers to this Defendant as Dr. Cordero, and directs the **Clerk** to substitute "Doctor Cordero" for "Doctor Llorens" on the docket.

under the Eighth Amendment, the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA).

Before the Court are Defendants Centurion and Dr. Cordero's Motion to Dismiss, <u>see</u> Motion to Dismiss and Incorporated Memorandum of Law (Doc. 49; Centurion Motion); and Defendants FDOC and Dixon's Motion to Dismiss, <u>see</u> FDOC Defendants' Motion to Dismiss (Doc. 54; FDOC Motion). Kinard filed responses. <u>See</u> Plaintiff's Motion in Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss (Doc. 52; Centurion Response); Plaintiff's Motion in Opposition to Defendant's Motion to Dismiss (Doc. 55; FDOC Response). The Motions are ripe for review.

## II. Kinard's Allegations[2]

Kinard alleges that on March 24, 2022, while housed at Union Correctional Institution, he slipped on a puddle of water and severely injured his left foot. Amended Complaint at 8. Although he could stand and walk after the fall, Kinard contends he was in pain and his foot began to swell and "turn to a blood red." <u>Id.</u> Despite knowing of his symptoms, officers in Kinard's housing unit never called for medical to assist Kinard. <u>Id.</u>

_____

[2] In considering the Motion, the Court must accept all factual allegations in the Amended Complaint as true, consider the allegations in the light most favorable to Kinard, and accept all reasonable inferences that can be drawn from such allegations. <u>Hill v. White</u>, 321 F.3d 1334, 1335 (11th Cir. 2003); <u>Jackson v. Okaloosa Cnty.</u>, 21 F.3d 1531, 1534 (11th Cir. 1994). As such, the facts recited here are drawn from the Amended Complaint, and may well differ from those that ultimately can be proved.

Three days after the fall, Kinard submitted a sick call request because he could hardly walk; and when his first sick call request went unanswered, he submitted a second request. Id. On April 7, 2022, Nurse Gilbert finally evaluated Kinard and noted swelling and discoloration on the top and bottom of his foot. Id. at 8-9. Gilbert asked Kinard why he did not declare a medical emergency for the injury and instructed him to seek emergency care for similar injuries in the future. Id. Gilbert then took Kinard to see the doctor on duty, who issued crutches, prescribed Ibuprofen, and told Kinard x-rays would be conducted on April 11, 2022. Id. at 9. Medical staff, however, did not conduct x-rays on April 11, 2022. Id.

On April 12, 2022, hours after submitting a sick call request, Defendant Dr. Cordero and Nurse Putnam examined Kinard's foot, wrapped it in an ace bandage, issued a two-week bed-rest pass and a pass for crutches, and advised him that x-rays would be conducted on April 18, 2022. Id. Medical staff then conducted x-rays of Kinard's foot on April 18, 2022. Id. According to Kinard, however, his bed-rest and crutches passes expired on April 27, 2022, without another follow up with medical. Id.

Kinard alleges officials made him return to work on April 28, 2022. Id. Because his job requires a lot of walking, Kinard's foot became very swollen, and he experienced severe pain. Id. at 10. He submitted another sick call request on May 7, 2022, and was seen by Nurse Gilbert on May 11, 2022. Id.

3

During the May 11 exam, Gilbert advised Kinard that medical was supposed to conduct a follow up after his April 18 x-rays and explained to Kinard that he had an appointment to see the doctor on May 13, 2022. Id. But Kinard alleges he did not see the doctor on May 13. Id.

Because of the swelling and pain he was experiencing, Kinard submitted additional sick call requests on May 14 and May 16, 2022. Id. Kinard asserts Dr. Cordero eventually conducted a follow up exam on May 18, 2022, during which Dr. Cordero advised that Kinard's x-rays "were good and that nothing was wrong, and that he had a mild sprain." Id. Dr. Cordero also explained there was "no need" for Kinard to have received a follow up exam the week after his x-rays and when Kinard asked if it was possible that he suffered torn tendons, ligament, or something more serious, Dr. Cordero responded, "you're getting old and it will take a long time to heal, and the x rays showed you are fine." Id. at 10-11. Dr. Cordero then refused to give Kinard anything to alleviate his pain and advised Kinard to return to work. Id. at 11.

The next day, May 19, Nurse Gilbert evaluated Kinard and issued another three-day bed-rest pass while he waited for medical to conduct a second x-ray scheduled for May 23, 2022. Id. The May 23 x-ray was rescheduled to May 31, 2022. Id. On June 3, 2022, Dr. Cordero examined Kinard and advised him that his foot was fractured. Id. at 11. According to Dr. Cordero, because the injury occurred so long ago and they initially missed the fracture,

"it [would] take six months, a year, or longer to heal." Id. Dr. Cordero also stated he would consult an orthopedic surgeon but explained that "because of the time frame of the fracture there is nothing they can do." Id. Kinard asked Dr. Cordero for pain medication and a "lay in" pass, but Dr. Cordero advised there was nothing he could do and recommended that Kinard return to work. Id.

On June 10, 2022, Dr. Cordero advised Kinard he would be placed in an air cast and would be evaluated again in three to six weeks. Id. at 11-12. Dr. Cordero also stated he consulted an orthopedic surgeon and "was told this would heal." Id. at 12. Dr. Cordero again advised Kinard his foot was "healing just fine" and because of Kinard's age, it would take time. Id. That day, a nurse put a "used air cast" on Kinard and advised the cast would be filled with air next week. Id. According to Kinard, wearing the airless air cast increased his pain and swelling. Id. On June 23, 2022, Kinard submitted another sick call request complaining he had yet to receive air in his air cast and he had not received the medical passes listed on his medical records. Id.

On June 27, 2022, medical staff issued passes for "no pulling or lifting 15 lbs, low bunk, adaptive device, no standing over 10 minutes, with 5 minute rest in between." Id. at 12-13. On July 8, 2022, Dr. Cordero evaluated Kinard and advised "that his foot was overlapping and that he wanted to put him in to see an orthopedic surgeon but that he wouldn't guarantee surgery." Id. at 13.

Kinard signed the papers needed for the consultation, but Kinard was not allowed to read all the consultation paperwork. Id. Dr. Cordero also told Kinard he would give him a prescription for Ibuprofen, but he ignored Kinard's request to add air to his air cast. Id. According to Kinard, since June 10, 2022, he has been forced to walk, work, and climb stairs with an air cast containing no air. Id. 13-14. Kinard states he suffers daily, and his foot has not healed properly. Id. Medical staff and the FDOC are aware of his foot injury, but they continue to force Kinard to work and walk in an air cast with no air. Id. at 14.

In his Amended Complaint, Kinard raises three claims related to his injury and medical treatment. In Counts One and Two, Kinard sues Defendant FDOC for allegedly violating his rights under the ADA and RA.[3] Id. at 14-19. He asserts his fractured foot substantially limits his daily activities and qualifies him as a disabled individual under 42 U.S.C. § 12102(2). Id. at 15. He alleges that by withholding medical treatment for inmates with fractures while not withholding treatment for inmates with other disabilities or inmates with no disabilities, Defendant FDOC has subjected Kinard to discrimination and denied him equal access to services. Id. at 16. For example, he asserts that he

---

[3] Kinard does not reference Defendant Dixon in his allegations for either Count One or Count Two. See Amended Complaint at 14-19. He mentions Dixon once in his factual allegations, asserting "[a]t the times relevant hereto, Defendant[] Centurion, and Doctor [Cordero], via Defendant Dixon failed to provide adequate medical treatment." Id. at 8.

6

is "unable to participate in recreation and other physical exercise" and "in the event of a prison fight, . . . [he] would be unable to escape quickly." <u>Id.</u> Kinard contends that as a direct cause of Defendant FDOC's discrimination, he has suffered and continues to suffer harm. <u>Id.</u> at 17, 19. As relief for these alleged ADA and RA violations, he seeks compensatory damages. <u>Id.</u> at 17, 19.

In Count Three, Kinard sues Defendants Dr. Cordero and Centurion under the Eighth Amendment. <u>Id.</u> at 20-23. He asserts Centurion and Dr. Cordero, along with their "policy makers," "knew about and enforced policies, practices, and/or custom[s] that exhibited deliberate indifference to [Kinard's] serious medical needs . . . ." <u>Id.</u> at 20. According to Kinard, Centurion and Dr. Cordero, "acting through their employees and agents," intentionally delayed, failed, and refused to provide Kinard with treatment to address his foot injury despite knowing their actions would result in continued suffering. <u>Id.</u> Kinard alleges that Centurion and Dr. Cordero's actions worsened his condition, and as a direct result of their policies, practices, and customs, he has suffered permanent physical injuries and emotional pain. <u>Id.</u> at 21-22. As relief, he seeks compensatory and punitive damages. <u>Id.</u> at 22.

### III. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508 n.1 (2002); <u>see</u>

also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1262-63 (11th Cir. 2004). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (quotations, citation, and original alteration omitted). Indeed, "the tenet that a court must accept as true

all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570). And, while "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed," Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998), "'this leniency does not give a court license to serve as de facto counsel for a party or to rewrite an otherwise deficient pleading in order to sustain an action.'" Campbell v. Air Jamaica Ltd., 760 F.3d 1165, 1168-69 (11th Cir. 2014) (quoting GJR Invs., Inc. v. Cnty. of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998), overruled in part on other grounds as recognized in Randall, 610 F.3d at 709).

## IV.   Discussion

### a.  Centurion Motion

Defendants Centurion and Dr. Cordero raise three arguments supporting their request to dismiss Kinard's Amended Complaint. See generally Centurion Motion. First, they argue Kinard misrepresented his prior lawsuits to the Court. Id. at 5-7. Second, they assert Kinard fails to state a claim against Dr. Cordero. Id. at 7-13. And third, they contend Kinard fails to

state a claim against Centurion. Id. at 14-20. In his Response, Kinard argues he did not intentionally misrepresent his prior lawsuits but inadvertently omitted cases because he forgot about the prior actions and the cases did not challenge the conditions of his confinement. Centurion Response at 2. He also contends that he states a plausible Eighth Amendment claim against both Dr. Cordero and Centurion. Id. at 4-13. Because the Court finds Kinard fails to state a plausible claim for which relief may be sought against Dr. Cordero and Centurion, it declines to address the other argument in the Centurion Motion.

### i. *Defendant Dr. Cordero – Failure to State a Claim*

Dr. Cordero argues Kinard fails to state a plausible Eighth Amendment claim against him. See Centurion Motion at 7-13. In his Response, Kinard asserts his allegations about Dr. Cordero's delayed treatment are sufficient to state a plausible claim against Dr. Cordero in his individual capacity. See Centurion Response at 4-10.

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's

conduct. Swain v. Junior, 961 F.3d 1276, 1285 (11th Cir. 2020) (citing Farmer, 511 U.S. at 834); Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004).

As it relates to medical care, "the Supreme Court has held that prison officials violate the bar on cruel and unusual punishments when they display 'deliberate indifference to serious medical needs of prisoners.'" Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To prevail on a deliberate indifference claim, a plaintiff must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009).

> "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). To meet the first prong, the plaintiff must demonstrate an "objectively serious medical need – i.e., "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and, in either instance, "one that, if left unattended, poses a substantial risk of serious harm." Id. (alteration adopted) (quotations omitted). To satisfy the second, subjective prong, the plaintiff must prove that the prison officials "acted with deliberate indifference to [his serious medical] need." Harper v. Lawrence Cnty., 592 F.3d 1227, 1234 (11th Cir. 2010) (quotation omitted). "To establish deliberate indifference," a plaintiff must demonstrate that the prison officials "(1)

11

> had subjective knowledge of a risk of serious harm; (2)
> disregarded that risk; and (3) acted with more than
> gross negligence." <u>Id.</u> (quotation omitted).[4] An
> inmate-plaintiff bears the burden to establish both
> prongs. <u>Goebert v. Lee Cnty.</u>, 510 F.3d 1312, 1326
> (11th Cir. 2007).

<u>Hoffer v. Sec'y, Fla. Dep't of Corr.</u>, 973 F.3d 1263, 1270 (11th Cir. 2020)

(footnote omitted); <u>see</u> <u>Johnson v. Lewis</u>, 83 F.4th 1319, 1327 & n.2 (11th Cir.

2023). Importantly, for allegedly inadequate medical treatment to rise to the

level of a constitutional violation, the care must be "'so grossly incompetent,

inadequate, or excessive as to shock the conscience or to be intolerable to

fundamental fairness.'" <u>Hoffer</u>, 973 F.3d at 1271 (quoting <u>Harris v. Thigpen</u>,

941 F.2d 1495, 1505 (11th Cir. 1991)); <u>see also</u> <u>Waldrop v. Evans</u>, 871 F.2d

1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can

constitute deliberate indifference . . . as can a doctor's decision to take an easier

and less efficacious course of treatment" (internal citation omitted) or fail to

respond to a known medical problem).

"As applied in the prison context, the deliberate-indifference standard

sets an appropriately high bar." <u>Swain</u>, 961 F.3d at 1285. Indeed, the law is

---

[4] The Eleventh Circuit has recognized "a tension within [its] precedent regarding the minimum standard for culpability under the deliberate-indifference standard." <u>Hoffer v. Sec'y, Fla. Dep't of Corr.</u>, 973 F.3d 1263, 1270 n.2 (11th Cir. 2020). Regardless, the court stated that the "competing articulations – 'gross' vs. 'mere' negligence" – may be "a distinction without a difference" because "no matter how serious the negligence, conduct that can't fairly be characterized as reckless won't meet the Supreme Court's standard." <u>Id.</u>; <u>see also</u> <u>Patel v. Lanier Cnty.</u>, 969 F.3d 1173, 1188 n.10 (11th Cir. 2020).

well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. <u>Daniels v. Williams</u>, 474 U.S. 327, 330-31 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344, 348 (1986) ("As we held in <u>Daniels</u>, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." <u>Bingham v. Thomas</u>, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotations and citation omitted). The Eleventh Circuit has also noted that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." <u>Bismark v. Fisher</u>, 213 F. App'x 892, 897 (11th Cir. 2007) (quoting <u>Waldrop</u>, 871 F.2d at 1033).[5] Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an

---

[5] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060–61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

Dr. Cordero does not dispute that Kinard's foot injury constituted an objectively serious medical need. See generally Centurion Motion. Instead, Dr. Cordero argues that Kinard fails to allege that he acted with deliberate indifference to Kinard's need for medical care by conduct that was more than grossly negligent. Id. at 10-12. He also argues Kinard has not alleged that his actions exacerbated Kinard's injury. Id. at 13.

Accepting Kinard's factual allegations as true, the Court finds Kinard fails to state a plausible claim of deliberate indifference related to Dr. Cordero's medical care. Kinard alleges that between April 12 and July 8, 2022, Dr. Cordero examined Kinard five times, ordered several x-rays of his foot, and provided him crutches, Ibuprofen, an ace bandage, various medical passes, and an air cast. Kinard also states Dr. Cordero consulted an orthopedic surgeon twice, who informed Dr. Cordero that Kinard's injury would heal but due to his age, his healing may take time. While Dr. Cordero did not discover the fracture until Kinard's second x-ray, Dr. Cordero's misreading of Kinard's first x-ray and delayed diagnosis demonstrates, at best, evidence of negligence or malpractice, not deliberate indifference. See, e.g., Loosier v. Unknown Med. Dr., 435 F. App'x 302, 307 (5th Cir. 2010) (finding the plaintiff failed to state a deliberate indifference claim against x-ray technician who misread the

plaintiff's x-ray and wrongly informed doctor that the plaintiff did not have a neck injury). Indeed, Kinard does not allege Dr. Cordero saw the fracture in the first x-ray but disregarded that fact and failed to provide any treatment.

Instead, Kinard seems to disagree with Dr. Cordero's medical judgment in providing treatment after he discovered the fracture, alleging that Dr. Cordero should have "repair[ed]/set the broken bone(s)," put air in Kinard's airless air cast, and prevented Kinard's return to work. See Amended Complaint at 22. But Kinard's disagreement with Dr. Cordero's medical decisions does not support a claim for deliberate indifference. Rather, Dr. Cordero's alleged actions "are 'classic example[s] of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." See Williams v. Barrow, 559 F. App'x 979, 985 (11th Cir. 2014) (quoting Adams, 61 F.3d at 1545). Thus, Dr. Cordero's Motion is due to be granted as to this issue, and Kinard's Eighth Amendment claim against Dr. Cordero will be dismissed.

### ii.    *Defendant Centurion – Failure to State a Claim*

Defendant Centurion argues that Kinard fails to allege an Eighth Amendment claim against it because he does not identify a Centurion policy, custom, or practice that caused his alleged injury. Centurion Motion at 14-20. In his Response, Kinard seemingly asserts Centurion has a widespread

practice and policy of delaying treatment, which forced Kinard to "walk[ ] around on a broken foot for several months . . . ." Centurion Response at 11-12.

"Where a function which is traditionally the exclusive prerogative of the state . . . is performed by a private entity, state action is present" for purposes of § 1983. Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 703 (11th Cir. 1985) (citations omitted). Because Centurion contracts with the FDOC to provide medical services to state inmates, it is subject to suit under § 1983. But where a deliberate indifference medical claim is brought against an entity, such as Centurion, based on its functional equivalence to a government entity, the assertion of a constitutional violation is merely the first hurdle in Kinard's case. This is so because liability for constitutional deprivations under § 1983 cannot stem from the theory of respondeat superior. Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003)); see Denno v. Sch. Bd. of Volusia Cnty., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may be liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Thus, like claims against a county, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the

alleged constitutional deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 693-94 (1978).

Because Centurion's liability under § 1983 would stem from its functional equivalence to the government entity responsible for providing medical care and services to FDOC inmates, Kinard must plead that an official policy or a custom or practice of Centurion was the moving force behind the alleged federal constitutional violation. In Monell, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. But this liability is limited to "acts which the [government entity] has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Under the directives of Monell, a plaintiff also must allege that the constitutional deprivation resulted from "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d at 1276 (citations omitted); see Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating Monell "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity] or created by an official of such rank that he or she could be said to be acting

on behalf of the [government entity]." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of employees of the [government entity], and thereby make clear that [governmental] liability is limited to action for which the [government entity] is actually responsible.'" Grech, 335 F.3d at 1329 n.5 (quotation and citation omitted). Governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers. City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur, 475 U.S. at 483-84). A government entity rarely will have an officially adopted policy that permits a particular constitutional violation; therefore, to state a cause of action for damages under § 1983, most plaintiffs must show that the government entity has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." Sewell, 117 F.3d at 489. Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted).

In his Amended Complaint, Kinard makes a passing reference to Centurion and Dr. Cordero "enforce[ing] policies, practices, and/or custom[s] that exhibited deliberate[] indifference to [Kinard's] serious medical needs in violation of the Eighth Amendment." Amended Complaint at 20. However, Kinard's single conclusory statement is not sufficient to demonstrate a "widespread policy" needed to allege a claim against Centurion. Indeed, Kinard's factual allegations only discuss Dr. Cordero's delayed treatment for a single foot injury. But Centurion cannot be held liable based on any alleged conduct of or decisions by its employees simply because they were working under contract for Centurion to provide medical care to inmates. Likewise, Kinard's factual allegations relating only to alleged individual failures in his medical care simply cannot sustain a claim that there is either a policy to deny or delay medical care to inmates or a practice or custom of denying or delaying adequate medical care, much less that the practice was so widespread that Centurion had notice of violations and made a "conscious choice" to disregard them. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). Thus, the Court finds that Kinard has not stated an Eighth Amendment claim against Centurion and its motion is due to be granted.

b.  FDOC Motion

Defendants FDOC and Dixon raise five arguments supporting their request to dismiss Kinard's Amended Complaint. See generally FDOC Motion.

They assert Kinard did not exhaust his administrative remedies; they are entitled to Eleventh Amendment immunity; Kinard fails to state plausible ADA and RA claims against them; Kinard cannot recover damages under the ADA and RA; and Kinard has failed to adequately allege entitlement to declaratory or injunctive relief. See generally id. In his Response, Kinard alleges he exhausted his administrative remedies, he has plausibly alleged sufficient ADA and RA claims, he has alleged the FDOC acted in bad faith to allow recovery of damages, and he has alleged entitlement to declaratory and injunctive relief. See generally FDOC Response. Because the Court finds Kinard fails to state a plausible claim for which relief may be sought against Defendants Dixon and the FDOC, it declines to address the other arguments in their Motion.

### Defendants FDOC and Dixon – Failure to State a Claim[6]

Defendants FDOC and Dixon argue that Kinard fails to state a claim upon which relief may be granted under the ADA and RA. See FDOC Motion at 14-21. Title II of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public

---

[6] Although Kinard does not name Defendant Dixon in Counts One and Two, the Court assumes, for purposes of this Order, that Kinard intended to include Dixon in those claims.

entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132;

see also Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 213 (1998)

(holding Title II of the ADA "unambiguously extends to state prison inmates").

"Only public entities are liable for violations of Title II of the ADA." Edison v.

Douberly, 604 F.3d 1307, 1308 (11th Cir. 2010). Similarly, section 504 of the

RA provides, "No otherwise qualified individual with a disability . . . shall,

solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program

or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

"With the exception of its federal funding requirement, the RA uses the

same standards as the ADA, and therefore, cases interpreting either are

applicable and interchangeable." Badillo v. Thorpe, 158 F. App'x 208, 214 (11th

Cir. 2005) (citing Cash v. Smith, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000));

J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ., 877 F.3d 979, 985

(11th Cir. 2017) ("Discrimination claims under the ADA and the [RA] are

governed by the same standards, and the two claims are generally discussed

together."). To state a claim of discrimination under the ADA and RA, a

plaintiff must allege "(1) that he is a qualified individual with a disability; and

(2) that he was either excluded from participation in or denied the benefits of

a public entity's services, programs, or activities, or was otherwise

discriminated against by the public entity; and (3) that the exclusion, denial of

21

benefit, or discrimination was by reason of the plaintiff's disability." Owens v. Sec'y, Fla. Dep't of Corr., 602 F. App'x 475, 477 (11th Cir. 2015) (quoting Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007)).

Because only public entities may be liable under the ADA and RA, Kinard fails to state a claim against Defendant Dixon in his individual capacity. See, e.g., Owens, 602 F. App'x at 477, 478; Badillo, 158 F. App'x at 211 ("[T]here is no individual capacity liability under Title II of the ADA or RA."). Thus, the FDOC Motion is due to be granted to the extent that Kinard raises any claim under the ADA and RA against Dixon in his individual capacity.

Kinard also fails to sufficiently allege an ADA or RA claim against Dixon and the FDOC in their official capacities. Assuming Kinard is a qualified individual with a disability, Kinard identifies no program or service to which he was denied access because of his injury. Rather, Kinard premises his ADA and RA claims on a perceived refusal to provide him adequate medical care for his foot injury and his contention that the alleged injury has prevented him from enjoying "recreation and other physical exercise." Amended Complaint at 16. But the ADA and RA were not intended to subsume medical malpractice claims, meaning allegations that a defendant failed to provide medical care to a disabled inmate does not give rise to claims under the ADA or RA. See Jones v. Rutherford, 546 F. App'x 808, 811-12 (11th Cir. 2013); Finn v. Haddock, 459

F. App'x 833, 837-38 (11th Cir. 2012) (stating that "failure to provide adequate medical treatment . . . does not violate the ADA or [RA]" (citations omitted)). Kinard's allegations are more appropriate in a claim challenging the denial of adequate medical care under the Eighth Amendment rather than for a failure to accommodate. Thus, the FDOC Motion is due to be granted as to this issue, and Kinard's ADA and RA claims against Dixon and the FDOC in their official capacities will be dismissed.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.     Defendants Centurion and Dr. Cordero's Motion to Dismiss (Doc. 49) is **GRANTED to the extent** that Kinard's claims under the Eighth Amendment are **DISMISSED with prejudice**.

2.     Defendants Dixon and the FDOC's Motion to Dismiss (Doc. 54) is **GRANTED to the extent** that Kinard's claims under the ADA and RA are **DISMISSED with prejudice**.

3.    The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 22nd day of January, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-7

C:    Roy David Kinard, #969084
      Counsel of record