UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROY DAVID KINARD,

        Plaintiff,

v.                            Case No. 3:22-cv-897-MMH-MCR

FLORIDA DEPARTMENT
OF CORRECTIONS,

        Defendant.

_____

## ORDER

### I. Status

Plaintiff Roy David Kinard, an inmate of the Florida Department of

Corrections (FDOC), initiated this action by filing a pro se Civil Rights

Complaint (Doc. 1) under 42 U.S.C. § 1983. He is proceeding on an Amended

Complaint (Doc. 33; Amended Complaint). This cause is before the Court

following the Eleventh Circuit Court of Appeals' opinion vacating this Court's

Order granting Defendant FDOC's Motion to Dismiss to the extent that it

dismissed Kinard's Americans with Disabilities Act (ADA) and Rehabilitation

Act (RA) claims against FDOC. See Opinion (Doc. 67); Mandate (Doc. 68). The

Eleventh Circuit directed this Court, on remand, to provide Kinard with an

opportunity to develop the record on exhaustion, and then decide the merits of

FDOC's argument that Kinard failed to exhaust his ADA and RA claims. See Opinion at 17-18.

Before the Court is FDOC's Renewed Motion to Dismiss. See Motion (Doc. 71). In accordance with the Eleventh Circuit's opinion, the Court provided Kinard with an opportunity to respond to the Motion and produce "any evidence on which he seeks to rely to show that he properly exhausted his administrative remedies." See Doc. 70. Kinard filed a response in opposition (Doc. 72), as well as a "Motion in Opposition to Defendant's Rule 12 Motion to Dismiss" (Doc. 73) (collectively, Responses). The Motion is ripe for review.

## II. Kinard's Allegations[1]

In this action, Kinard alleges that on March 24, 2022, while housed at Union Correctional Institution, he slipped on a puddle of water and severely injured his left foot. Amended Complaint at 8. Although he could stand and walk after the fall, Kinard contends he was in pain and his foot began to swell and "turn to a blood red." Id. Despite knowing of his symptoms, officers in Kinard's housing unit never called for medical to assist Kinard. Id.

Three days after the fall, Kinard submitted a sick call request because he could hardly walk; and when his first sick call request went unanswered,

---

[1] Because the only issues remaining are Kinard's ADA and RA claims against Defendant FDOC, the Court's summary of Kinard's allegations is limited to those assertions.

2

he submitted a second request. Id. On April 7, 2022, Nurse Gilbert finally evaluated Kinard and noted swelling and discoloration on the top and bottom of his foot. Id. at 8-9. Gilbert asked Kinard why he did not declare a medical emergency for the injury and instructed him to seek emergency care for similar injuries in the future. Id. Gilbert then took Kinard to see the doctor on duty, who issued crutches, prescribed Ibuprofen, and told Kinard x-rays would be taken on April 11, 2022. Id. at 9. Medical staff, however, did not complete x-rays on April 11, 2022. Id.

On April 12, 2022, hours after Kinard submitted a sick call request, Dr. Cordero and Nurse Putnum examined Kinard's foot, wrapped it in an ace bandage, issued a two-week bed-rest pass and a pass for crutches, and advised Kinard that x-rays would be taken on April 18, 2022. Id. Medical staff then completed x-rays of Kinard's foot on April 18, 2022. Id. According to Kinard, however, his bed-rest and crutches passes expired on April 27, 2022, without another follow up with medical. Id.

Kinard alleges officials made him return to work on April 28, 2022. Id. Because his job requires a lot of walking, Kinard's foot became very swollen, and he experienced severe pain. Id. at 10. He submitted another sick call request on May 7, 2022, and was seen by Nurse Gilbert on May 11, 2022. Id. During the May 11 exam, Gilbert advised Kinard that medical was supposed to conduct a follow up after his April 18 x-rays and explained to Kinard that

3

he had an appointment to see the doctor on May 13, 2022. <u>Id.</u> But Kinard alleges he did not see the doctor on May 13. <u>Id.</u>

Because of the swelling and pain he was experiencing, Kinard submitted additional sick call requests on May 14 and May 16, 2022. <u>Id.</u> Kinard asserts Dr. Cordero eventually conducted a follow up examination on May 18, 2022, during which Dr. Cordero advised that Kinard's x-rays "were good and that nothing was wrong, and that he had a mild sprain." <u>Id.</u> Dr. Cordero also explained there was "no need" for Kinard to have received a follow up exam the week after his x-rays and when Kinard asked if it was possible that he suffered torn tendons, ligament, or something more serious, Dr. Cordero responded, "you're getting old and it will take a long time to heal, and the x[-]rays showed you are fine." <u>Id.</u> at 10-11. Dr. Cordero then refused to give Kinard anything to alleviate his pain and advised Kinard to return to work. <u>Id.</u> at 11.

The next day, May 19, Nurse Gilbert evaluated Kinard and issued another three-day bed-rest pass while he waited for medical to take a second x-ray scheduled for May 23, 2022. <u>Id.</u> The May 23 x-ray was rescheduled to May 31, 2022. <u>Id.</u> On June 3, 2022, Dr. Cordero examined Kinard and advised him that his foot was fractured. <u>Id.</u> at 11. According to Dr. Cordero, because the injury occurred so long ago and they initially missed the fracture, "it [would] take six months, a year, or longer to heal." <u>Id.</u> Dr. Cordero also stated he would consult an orthopedic surgeon but explained that "because of the time

4

frame of the fracture there is nothing they can do." <u>Id.</u> Kinard asked Dr. Cordero for pain medication and a "lay in" pass, but Dr. Cordero advised there was nothing he could do and recommended that Kinard return to work. <u>Id.</u>

On June 10, 2022, Dr. Cordero advised Kinard he would be placed in an air cast and would be evaluated again in three to six weeks. <u>Id.</u> at 11-12. Dr. Cordero also stated he consulted an orthopedic surgeon and "was told this would heal." <u>Id.</u> at 12. Dr. Cordero again advised Kinard his foot was "healing just fine" and because of Kinard's age, it would take time. <u>Id.</u> That day, a nurse put a "used air cast" on Kinard and advised the cast would be filled with air next week. <u>Id.</u> According to Kinard, wearing the airless air cast increased his pain and swelling. <u>Id.</u> On June 23, 2022, Kinard submitted another sick call request complaining he had yet to receive air in his air cast and he had not received the medical passes listed on his medical records. <u>Id.</u>

On June 27, 2022, medical staff issued passes for "no pulling or lifting 15 lbs, low bunk, adaptive device, no standing over 10 minutes, with 5 minute rest in between." <u>Id.</u> at 12-13. On July 8, 2022, Dr. Cordero evaluated Kinard and advised "that his foot was overlapping and that he wanted to put him in to see an orthopedic surgeon but that he wouldn't guarantee surgery." <u>Id.</u> at 13. Kinard signed the papers needed for the consultation, but was not allowed to read all the consultation paperwork. <u>Id.</u> Dr. Cordero also told Kinard he would give him a prescription for Ibuprofen, but he ignored Kinard's request to add

air to his air cast. Id. According to Kinard, since June 10, 2022, he has been forced to walk, work, and climb stairs with an air cast containing no air. Id. 13-14. Kinard states he suffers daily, and his foot has not healed properly. Id. Medical staff and the FDOC are aware of his foot injury, but they continue to force Kinard to work and walk in an air cast with no air. Id. at 14.

Kinard asserts his fractured foot substantially limits his daily activities and qualifies him as a disabled individual under 42 U.S.C. § 12102(2); and he sues Defendant FDOC for allegedly violating his rights under the ADA and RA. Id. at 15. He alleges that by withholding medical treatment for inmates with fractures while not withholding treatment for inmates with other disabilities or inmates with no disabilities, Defendant FDOC has subjected Kinard to discrimination and denied him equal access to services. Id. at 16. For example, he asserts that he is "unable to participate in recreation and other physical exercise" and "in the event of a prison fight, . . . [he] would be unable to escape quickly." Id. Kinard contends that as a direct cause of Defendant FDOC's discrimination, he has suffered and continues to suffer harm. Id. at 17, 19. As relief, he seeks compensatory damages. Id. at 17, 19.

### III. Summary of Parties' Positions on Exhaustion

FDOC argues that Kinard failed to exhaust his administrative remedies as to his ADA and RA claims because none of the grievances he submitted between March 24, 2022, and April 11, 2023, included claims about

6

experiencing disability discrimination or failures to accommodate his disability. Motion at 11. Indeed, according to FDOC, none of Kinard's grievances even mentioned that he had a disability. Id. at 14. Instead, FDOC asserts that all the grievances Kinard filed complained only about his alleged lack of medical care. Id. In furtherance of that position, FDOC contends that the institutional officials and the Office of the Secretary treated Kinard's grievances as grievances relating to inadequate medical treatment, labeling each of the grievances on Kinard's grievance logs as "class code '07H-Inadequate Treatment (Medical)'" rather than classifying them as relating to ADA or RA claims. Id. at 15. In support of its argument, FDOC attaches a log of the four formal grievances that Kinard submitted between March 24, 2022, and April 11, 2023; a log of the four grievance appeals that Kinard submitted between March 24, 2022, and March 20, 2023; as well as copies of those four formal grievances and four grievance appeals and the officials' responses thereto. See Docs. 71-2 to 71-6.

In response, Kinard asserts he exhausted his administrative remedies and "put FDOC on notice of his disability while being denied proper medical care or accommodations needed to keep [him] from walking, working, [or] climbing stairs[] on a broken foot." Doc. 73 at 1. Relying on the allegations he presented in the same four formal grievances and four grievance appeals that FDOC attaches to its Motion, Kinard argues that FDOC knew Kinard needed

7

accommodations and medical passes for his disability. Id. at 12-13. But, according to Kinard, FDOC's responses to those grievances failed to acknowledge or mention Kinard's ADA status and only addressed complaints about his need for medical treatment. Id. at 9-11. He contends that officials responded through "boilerplate replies" that showed FDOC "did not read the grievances" and confused the issues Kinard included in those grievances. Id. at 10. In support, Kinard attaches the same eight grievances and corresponding responses for the Court's consideration. See Doc. 73-1 through Doc. 73-4.

Kinard also appears to argue that FDOC received notice of his ADA and RA claims through other means. In support of that argument, Kinard provides several affidavits, in one of which he states that because his broken foot impaired his mobility and medical staff issued him crutches and passes, he was considered disabled under FDOC's written procedures, and that fact alone placed FDOC on notice of his ADA status. See Doc. 73-5 at 2, 4.

Alternatively, Kinard seemingly argues that FDOC's inmate manual for the grievance procedure contains very little information and fails to clearly direct inmates on how to properly exhaust a claim or file administrative grievances. Doc. 73 at 5. And to that end, he appears to argue that FDOC's failure to provide adequate information and instructions about how to grieve

his ADA and RA claims rendered the grievance process for those claims unavailable. Id.; see also Doc. 73-5 at 3.

## IV. Analysis

The Prison Litigation Reform Act (PLRA) requires Kinard to exhaust his available administrative remedies before pursuing a § 1983 claim about prison conditions. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted."); see also Woodford v. Ngo, 548 U.S. 81, 92-93 (2006) (noting that a prisoner must exhaust administrative remedies before challenging the conditions of confinement, and concluding that the PLRA demands "proper exhaustion"). Nevertheless, Kinard need not "specially plead or demonstrate exhaustion in [his] complaint[]." See Jones v. Bock, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized that "failure to exhaust is an affirmative defense under the PLRA[.]" Id.

Importantly, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits[.]" Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008); see also Jones, 549 U.S. at 211. The Supreme Court has instructed that while "the PLRA exhaustion requirement is not jurisdictional[,]" Woodford, 548 U.S. at 101, "exhaustion is mandatory . . . and unexhausted claims cannot be brought[.]" Pavao v. Sims, 679 F. App'x 819, 823

(11th Cir. 2017) (per curiam) (citing <u>Jones</u>, 549 U.S. at 211).[2] Not only is there a recognized exhaustion requirement, "the PLRA . . . requires proper exhaustion" as set forth in applicable administrative rules and policies of the institution. <u>Woodford</u>, 548 U.S. at 93.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."

<u>Id.</u> at 90 (citation omitted). Indeed, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]" <u>Id.</u>

In <u>Ross v. Blake</u>, the Supreme Court instructed that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" 578 U.S. 632, 648 (2016). For an administrative remedy to

---

[2] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. Gov't Emps. Ins. Co.</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

be available, the "remedy must be 'capable of use for the accomplishment of [its] purpose.'" Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting Goebert v. Lee Cnty., 510 F.3d 1312, 1322-23 (11th Cir. 2007)). In Ross, the Court identified three circumstances in which an administrative remedy would be considered "not available." Ross, 578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Next, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Finally, a remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

Because failure to exhaust administrative remedies is an affirmative defense, Defendant bears "the burden of proving that [Kinard] has failed to exhaust his available administrative remedies." Turner, 541 F.3d at 1082. The Eleventh Circuit has articulated a two-step process that the Court must employ when examining the issue of exhaustion of administrative remedies.

> In Turner v. Burnside we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response

11

and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Id. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. Id. at 1082-83; see also id. at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015). At step two of the procedure established in Turner, the Court can consider facts outside the pleadings as long as those facts do not decide the case and the parties have had sufficient opportunity to develop the record. Bryant, 530 F.3d at 1376; see also Jenkins v. Sloan, 826 F. App'x 833, 838-39 (11th Cir. 2020).

State law "determines what steps are required to exhaust." Dimanche v. Brown, 783 F.3d 1204, 1207 (11th Cir. 2015); see also Jones, 549 U.S. at 218 (stating that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion"). The FDOC provides an internal grievance procedure for its inmates. See Fla. Admin. Code R. 33-103.001 through 33-103.018. Generally, to properly exhaust administrative remedies, a prisoner must complete a three-step sequential process. First, an inmate must submit an informal grievance at the institutional level to a designated staff member responsible for the specific problem. See Fla. Admin. Code R. 33-103.005. If the issue is not resolved, the inmate must submit a formal grievance

12

at the institutional level. <u>See</u> Fla. Admin. Code R. 33-103.006. If the matter is not resolved through formal and informal grievances, the inmate must file an appeal to the Office of the FDOC Secretary. <u>See</u> Fla. Admin. Code R. 33-103.007.

But the ordinary three-step procedure does not always apply. For example, a prisoner may skip the informal grievance step and immediately file a formal grievance for issues pertaining to various things, including "medical grievances" or a "grievance alleging violations of the [ADA]." Fla. Admin. Code r. 33-103.005(1); Fla. Admin. Code r. 33-103.008. If a prisoner can bypass the informal grievance step, he must typically file the formal grievance with the warden within 15 days from the date on which the incident or action being grieved occurred. Fla. Admin. Code r. 33-103.011(1)(b). A response must be provided to the inmate within 20 days of receipt of the formal grievance. Fla. Admin. Code r. 33-103.006(6). "If the inmate is unsatisfied with the resolution of a formal grievance, he may appeal the grievance to the Office of the Secretary using Form DC1-303 (same form as a formal grievance)." <u>Jenkins</u>, 826 F. App'x at 835 (citing Fla. Admin. Code Ann. R. 33-103.007). The grievance appeal to the Office of the Secretary must be received within 15 days from the date the response to the formal grievance is returned to the inmate. Fla. Admin. Code r. 33-103.11(c).

Also, an inmate may skip both the informal and formal grievance steps and file a direct emergency grievance with the Office of the Secretary, if the issue involves an emergency, reprisal, protective management, admissible reading material, release date calculations, banking issues, sexual abuse committed by the warden, or HIPAA violations. Fla. Admin. Code r. 33-103.007(3)(a). When a prisoner files a direct emergency grievance with the Secretary, he must do so "within 15 calendar days from the date on which the incident or action which is the subject of the grievance occurred." Fla. Admin. Code r. 33-103.011(d).

Here, accepting Kinard's view of the facts as true, the Court finds dismissal of the ADA and RA claims against FDOC for lack of exhaustion is not warranted at the first step of <u>Turner</u>. Thus, the Court proceeds to the second step of the two-part process in which the Court considers the parties' disputes about exhaustion and makes findings of fact.

In doing so, the Court first considers Kinard's argument that his grievances were sufficient to exhaust his administrative remedies. Both Kinard and FDOC agree that between March 24, 2022 (the day Kinard injured his foot) and August 15, 2022 (the day Kinard filed this case), Kinard submitted four formal grievances and four grievance appeals. <u>See</u> Doc. 71-2. The parties, however, dispute whether the allegations in those grievances were sufficient to place FDOC on notice of Kinard's ADA and RA claims.

Kinard's ADA and RA claims are based on allegations that FDOC engaged in disability discrimination because FDOC officials would not provide Kinard with accommodations for his injured foot, which left him without meaningful access to the prison's programs and activities. See Opinion at 15. Upon review of Kinard's grievances, the Court finds Kinard's grievance allegations did not place FDOC on notice of his ADA and RA claims.

On April 12, 2022, Kinard submitted his first formal grievance (log #2204-213-083), which provided, in pertinent part:

Medical issue:

On 3-24-22 in I-Dorm I slipped in water from the leaking roof on wing one . . . . On 3-27-22 a sick call slip was put in the box. I was never seen. On 4/4/22 I submitted another sick call. On 4-7-22 I was seen at sick call and was tak[en] over to see the doctor on duty. I was given crutches, my foot was wrapped and I was told that I would have ex rays [sic] done on 4/11/22 as I had a possible fracture in my foot. Further, I was told that I would be called back to see the doctor to go over my ex rays [sic] on 4/13/22. I've not been called for the ex rays [sic] and I'm not on the callout for the Dr. for 4/13/22. To note, my foot was swollen, black, in a lot of pain from the fall . . . . this has been 20 days since I've damaged my foot. If there is a fracture in my foot from not getting adequate medical care could very well have damaged my foot from [improper] healing. I'm requesting that I get the medical care needed ASAP as this has went on without proper care for to[o] long.

See Doc. 73-1 at 2, Doc. 71-3 at1. Officials denied the formal grievance (log #2204-213-083), advising Kinard that his records showed he received an x-ray on 4/18/22 and would have a follow up appointment soon. Doc. 71-3 at 2.

Kinard submitted a grievance appeal (log # 22-6-13257), which stated:

15

> Medical Appeal
>
> My argument in my grievance was that I did not receive the ex ray
> [sic] for my foot on the date I was told 4/11/2022. Further, I was
> not seen for a follow up visit on the 13th of April 2022. . . . The
> answer given does not pertain to the grievance written on 4/12/22.
> . . .

Doc. 71-3 at 3. Officials denied the grievance appeal (log #22-6-13257), stating
that "the response made to you by Dr. Llorens on 4/21/22 appropriately
addresses the issue you presented." Id. at 4.

On April 30, 2022, Kinard submitted his second formal grievance (log
#2205-213-006), in which he stated:

> Medical Issue
>
> On 4/18/2022 I received an ex ray [sic] for my foot from slipping in
> water from a leaking roof on 3/24/2022. I was told I would be seen
> with-in [sic] a few days, but before my lay in [pass] expired on April
> 27, 2022. I've not been seen and my left ankle is still swollen, in
> pain and is not healing as a lay person can see it[']s not right.

Doc. 71-4 at 1. Officials denied the second formal grievance (log #2205-213-
006), finding that Kinard's medical records showed he had a follow up
appointment with medical scheduled for the near future and he was seen in
sick call on May 10, 2022. Id. at 2.

Kinard submitted a grievance appeal (log #22-6-15549), which stated:

> Medical Issue Appeal:
>
> The answer to #2205-213-006 formal grievance does not address
> the issue[s] raised. As I was supposed to be seen for a follow visit
> ex ray [sic] within a week but before my lay in [pass] was up. The

answer was that I would be seen for a follow up in the near future and I was also seen on 5/10/22 sick call. The sick call was initiated from myself, not from medical or Department of Corrections doing anything to address the fact that there is a serious medical issue to my foot that I'm forced to walk, work on a swollen ankle in pain.

Doc. 71-4 at 3. Officials denied the grievance appeal (log #22-6-15549), explaining it is the responsibility of Kinard's health care staff to determine the appropriate treatment for his condition. Id. at 4. Officials stated that Kinard's medical records showed that medical staff again performed x-rays on 5/31/2022 and he was scheduled to see the physician to address any concerns. Id.

On May 16, 2022, Kinard submitted his third formal grievance (log #2205-213-091), in which he stated, in pertinent part:

Medical Issue:

. . . .

It is now 5/16/22 and I've still not seen any Dr. [M]y ankle is still swollen, discolored and I'm in continuous pain. This is clearly inappropriate medical treatment as this has been ongoing since March 24, 2022.

Doc. 71-5 at 1. On May 20, 2022, officials returned this formal grievance (log #2205-213-091) without action for being in noncompliance with Chapter 33-103.014(1)(m), which states, "A decision has already been rendered to an inmate by a particular office on the issue currently being grieved before it." Doc. 71-5 at 2.

Kinard submitted a grievance appeal (log #22-6-17001), stating:

Medical Issue:

My grievance was denied on 5/20/22 saying that the issue was previously addressed in grievance log # 2205-213-006. This is two separate issue[s], so the medical problem was not addressed. One issue dealt with ex rays [sic] and one issue dealt with not being seen by the DR. This is a serious problem and shows the inadequate medical [care] that has been going on since March 24, 2022.

Doc. 71-5 at 3. Officials returned the grievance appeal (log #22-6-17001) without action, again explaining that his administrative appeal was in non-compliance with Chapter 33-103, because Kinard's formal grievance was found to be in non-compliance at the institutional level. Doc. 71-5 at 4.

Kinard submitted his fourth formal grievance (log #2205-213-116) on May 19, 2022, in which he stated, in relevant part:

Medical Issues:

On 5/18/2022 I was seen by Dr. Lloren . . . and I explained that my foot . . . was still discolored, swollen, hurts when I walk and that I have constant pain. Dr. Lloren . . . explained that my ex rays [sic] showed that nothing was broken and the soft tissues were good. I asked about maybe it being my tendons, ligaments, or cartilages that were torn. Dr. Lloren at this point looked at the discolor[ed], swollen ankle and said that I'm getting old and it will take a[]while to heal, that there's nothing wrong with the soft tissues.

Ex-rays [sic] do not show soft tissues damage. Thus Dr. Llorens['s] diagnosis that there is nothing wrong with the soft tissue, tendons, ligaments, cartilages, etc. . . . is clearly indifferent to my injured ankle that is not healing.

A lay person can see that something is still wrong with my foot from slipping on the water on March 24, 2022.

18

Doc. 71-6 at 1. Officials denied this formal grievance (log #2205-213-116),

explaining the following:

> [T]here is no indication that you have been denied access to
> medical or denied medical care. Records reviewed indicate that you
> were seen by the onsite medical provider on 5/18/22, had a repeat
> x-ray on 5/31/2022, and have a follow up appointment with the
> onsite medical provider in the near future. You may not agree with
> the treatment regimen and you have the right to refuse treatment
> at any time, but that does not mean that you are not being provided
> adequate care.

Doc. 71-6 at 2.

Kinard submitted his final grievance appeal (log #22-6-18340) on June

10, 2022, where he stated the following:

> Medical Issue Appeal:
>
> The response to the formal grievance #2205-213-116 is inadequate
> where it states that I have not been denied "access to medical or
> denied medical care." This was not even the issue.
>
> The issue was that Dr. Lloren told me that the x-rays show that
> there was nothing broken and when I asked him about tendons,
> ligaments . . . he state[d] that "I was getting old and it would take
> a[]while to heal."
>
> This response by Dr. Lloren was not only clearly indifferent to the
> excruciating pain I was suffering, but also the fact that my ankle
> was still extremely swollen and discolored was never even
> considered.
>
> The response to the formal grievance also does not take into
> consideration the fact that my ankle has since been determined to
> be "broken" and I have been forced to walk on it for almost three
> months due to Dr. Llorens['s] indifference.

Doc. 71-6 at 3. Officials denied the grievance appeal (log # 22-6-18340) on July 1, 2022, stating that it was "determined that the response made to you by the Institution on 06/03/2022 appropriately addresses the issues you presented. Records reviewed indicate that you were seen by the Physician on 06/10/2022, where you could address your medical concerns at that time." Doc. 71-6 at 4.

The purpose of administrative exhaustion "is to put the [administrative authority] on notice of all issues in contention and to allow the [authority] an opportunity to investigate those issues." Chandler v. Crosby, 379 F.3d 1278, 1287 (11th Cir. 2004) (quotations and citation omitted) (alterations in original). The FDOC's rules provide that formal grievances must be legible, include accurately stated facts, and address only one issue or complaint; however, it does not include any requirements about the level of detail required for grievances. Fla. Admin. Code R. 33-103.005(2)(b)2; 33-103.006(2)(d)-(f). Where a prison's grievance procedure does not require a certain level of specificity, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002), overruled in part on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 (2007); see Harvard v. Inch, 411 F. Supp. 3d 1220, 1244 (N.D. Fla. 2019).

Here, Kinard's formal grievances and grievance appeals do not alert prison officials to his claims of disability discrimination and failure to provide accommodations. While he makes one passing reference that medical issued

20

him crutches and mentions his need for medical passes, his underlying allegations clearly focus on his claim about the lack of medical treatment for his injury, not how FDOC's failure to accommodate his disability hindered his access to prison programs and activities. As such, the Court finds that Defendant FDOC has met its burden in demonstrating that Kinard failed to complete the grievance process for his ADA and RA claims, rendering those claims unexhausted.

Next, the Court considers Kinard's argument that his injury and mobility issues alone placed FDOC on notice of his ADA and RA claims. But Florida's Administrative Code designates the steps necessary for an inmate to exhaust his administrative remedies and simply having mobility issues does not satisfy the requirements of exhaustion.

Finally, as to Kinard's allegation that FDOC's failure to provide adequate information and instructions about how to grieve his ADA and RA claims renders the grievance process for those claims unavailable, the Court also finds that argument unavailing. Indeed, the record refutes any allegation that Kinard was unaware of the two-step process he could have employed to exhaust his ADA and RA claims as he pursued that two-step procedure four times to complain about his lack of medical care. Accordingly, the Court finds that Kinard failed to exhaust his available administrative remedies for his ADA and RA claims, and FDOC's Motion is due to be granted.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.     Defendant FDOC's Renewed Motion to Dismiss (Doc. 71) is **GRANTED** and Kinard's Motion in Opposition (Doc. 73) is **DENIED**.

2.     Kinard's ADA and RA claims are **DISMISSED without prejudice** for his failure to exhaust his administrative remedies.

3.     The **Clerk** shall enter judgment dismissing Kinard's ADA and RA claims without prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 17th day of June, 2025.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-7

C:    Roy David Kinard, #969084
      Counsel of record